IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

RANDY COFFELT                                          PLAINTIFF

V.                            CASE NO. 3:17-CV-3101

OMAHA SCHOOL DISTRICT; and JACOB
SHERWOOD, Individually and in his Official
Capacity as Superintendent                            DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Currently pending before the Court are a Motion for Preliminary Injunction (Doc. 5) and Brief in Support (Doc. 6) submitted by Plaintiff Randy Coffelt and a Response (Doc. 12) and Brief (Doc. 13) in Opposition submitted by Defendants Omaha School District ("OSD" or "District") and its Superintendent, Dr. Jacob Sherwood. The Court heard oral argument on the Motion on January 19, 2018. In response to the Court's questions, the parties requested to submit additional briefs. Following an additional two-week period, the parties submitted their post-hearing briefs (Docs. 20 and 21, respectively). After considering these filings and the arguments made during the hearing, the Court will **GRANT** the Motion for a Preliminary Injunction (Doc. 5).

### I. BACKGROUND

### A. Factual Background

Mr. Coffelt is an alumnus of OSD and a parent of two of its former students, one graduate and a daughter who transferred from the District to neighboring Alpena School District. By all accounts, he is an involved citizen who has attended OSD events without

1

incident for the past 20 years.[1] In addition, both of his children did, and the youngest still does, play organized sports, which means that he often attends sporting events held on OSD school grounds. Finally, as a very small town,[2] Omaha's many community events, including Christmas programs, pee-wees, pageants, rodeos, school board meetings, etc., are held on OSD property. Indeed, Mr. Coffelt testified during the hearing, and Dr. Sherwood confirmed, that community life in Omaha largely revolves around events at OSD.

According to the Complaint and testimony during the motion hearing, Mr. Coffelt's older daughter allegedly experienced harassment and bullying for three years (2015-2017) at the hands of a coach (Jimmy Lincoln) employed by OSD. The Complaint alleges that Mr. Coffelt met numerous times with Dr. Sherwood in an effort to resolve this issue, to no avail. As a result, on April 10, 2017, Mr. Coffelt met with Dr. Sherwood again to inform him that he was moving his younger daughter to another district to avoid these same problems. Subsequently, the Complaint alleges that Dr. Sherwood informed Mr. Coffelt's wife, an OSD employee, that an investigation into Coach Lincoln's conduct had begun at the behest of an OSD School Board member. Dr. Sherwood testified during the hearing that although this investigation ultimately did not allow him to either confirm or deny the reports of bullying, it did uncover that Coach Lincoln had used profanity in front of OSD students during games and during "heated moments."

---

[1] Mr. Coffelt's connections to OSD run pretty deep. In addition to his and his children's history with OSD, Mr. Coffelt's wife continues to work for OSD as a teacher, he has friends and relatives who have students enrolled at OSD, and he is even listed as an "emergency contact" for one of the students currently enrolled at OSD.

[2] OSD enrolls some 400 students, according to Dr. Sherwood.

A closed-door meeting was held a couple of weeks later, on April 21, 2017, between Mr. Coffelt, Dr. Sherwood, and Coach Lincoln in Dr. Sherwood's office, which is in a building with no classrooms but with rooms down sometimes used for student purposes such as counseling.[3] The meeting apparently got heated and ended when Mr. Coffelt called Dr. Sherwood a liar and Coach Lincoln a "chicken shit" after they refused to answer his questions about the way his older daughter had been treated. The parties dispute what occurred next,[4] but it is undisputed that Dr. Sherwood asked Mr. Coffelt to leave, following him out of the office and telling him to "get the hell off my property." Dr. Sherwood admitted that this was not the first animated discussion he's had with parents where profanity was used. The day after this incident, Mr. Coffelt returned to OSD grounds to watch a softball game. Although Coach Lincoln was also present that day, there was no disturbance or commotion of any kind.[5]

On April 27, 2017, Dr. Sherwood sent Mr. Coffelt a letter stating that his conduct on April 21 substantially disrupted and disturbed the educational function in the District and that, effective immediately, Mr. Coffelt was forbidden from entering upon any District property until further notice. However, certain narrow exceptions to this categorical ban

---

[3] In fact, Mr. Coffelt testified that the District's campus is set up in a triangle formation, with the high school a parking lot away from Dr. Sherwood's office and the elementary school a county road away.

[4] The District's description of the meeting differs in important respects. The District contends that Mr. Coffelt refused to leave and that he was speaking at such a loud volume that Dr. Sherwood threatened to call the police. It does not appear from the testimony that the police were actually summoned that day, though a police report was filled out approximately a week later.

[5] Dr. Sherwood initially claimed during the hearing to have instructed Mr. Coffelt that he could not return to OSD school property following this incident, but later admitted that he had not in fact told Mr. Coffelt to leave and not come back. It was not until several days later that Mr. Coffelt learned that he had been "trespassed" from district property.

3

were made, including that Mr. Coffelt could attend a Graduation scheduled for May 12th (for his older daughter) and an Athletic Banquet scheduled for May 19th, and that he could enter District property in the event of an "extreme emergency involving [his] child after first contacting Mrs. Green (the school's principal)." (Doc. 1, p. 3). However, his attendance at those events would only be permitted if he was accompanied by a police escort, the costs of which were not to be borne by the District. *Id.* He was not permitted to attend any other events of any kind, as he was informed that attendance at any other event would result in a report to the police.

Mr. Coffelt did in fact attend both his older daughter's graduation on May 12, 2017, and the Athletic Banquet on May 19, 2017, with police escorts. Although there were no incidents during these events, Mr. Coffelt's police escorts were no more than eight feet from him at all times and apparently at one point inserted themselves in between Mr. Coffelt and his family to make their presence known.

Mr. Coffelt subsequently wrote the OSD School Board seeking permission[6] to appear in front of it to ask it to reconsider Dr. Sherwood's action. The School Board granted him permission to appear and speak. After Mr. Coffelt appeared at the July 17, 2017 Board Meeting to deliver his five-minute prepared remarks, the Board had no questions for him and did not make any public comments about his request.

Mr. Coffelt subsequently received a letter from Dr. Sherwood that mentioned his appearance at the School Board meeting and modified the restrictions that the District

---

[6] It appears from the District's website that School Board meetings are held at the OSD High School. Therefore, Mr. Coffelt appears to have, at all times, tried to make a good-faith effort to comply with the District's order while still expressing his dissatisfaction with his treatment.

was placing upon him. This letter informed Mr. Coffelt that he would be "allowed to enter District property ONLY for the athletic events in which your student may participate and when a police officer is on duty." (Doc. 1, p. 5). In addition, he was required to contact the High School Principal by phone or in writing at least 24 hours in advance if he planned to attend the event so that the District could be aware of his presence and could verify police presence. Other than these athletic events at which his student was competing, he was not to be present at any other event.

It appears that, after Mr. Coffelt's counsel sent a cease-and-desist letter to the school, Mr. Coffelt's access to OSD campus buildings was further modified. In a letter sent to Mr. Coffelt on October 5, 2017, counsel for OSD repeated the District's prior statement that Mr. Coffelt could attend events at OSD if Mr. Coffelt's children were participating. In addition, this letter stated that if there were other events or occasions where Mr. Coffelt believed he needed to enter OSD school property for any reason, he was to similarly give one day advanced notice.

Pursuant to this last letter, Mr. Coffelt did in fact request permission to attend events held on OSD school property on October 31, 2017; November 27, 2017; November 30, 2017; December 2, 2017; December 11, 2017; January 19, 2018; January 23, 2018; and February 5th-10th.[7] Though the tone of the last letter indicated that Mr. Coffelt would be allowed to attend events where his daughter was in attendance, OSD, through Dr. Sherwood, responded on October 26, 2017, that Mr. Coffelt would only be

_____

[7] Although these dates were the most pressing (as the closest in time) to the hearing, Mr. Coffelt's motion makes clear that he is seeking to enjoin OSD and Dr. Sherwood from prohibiting him from attending any events open to the general public. Therefore, the fact that these ten events have passed does not render his request for injunctive relief moot.

allowed to attend events on February 5 and February 8 (the two days his daughter had athletic games against OSD teams and, on those dates, ONLY during his daughter's games). He was denied permission to attend any other events.

The Complaint and the testimony during the hearing revealed that despite several instances where other parents engaged in similar (if not worse) conduct, Mr. Coffelt was the only one who had been banned from the District. Those other instances of parental conduct included:

- One parent who observed a teacher yelling at his child and pointing her finger in the child's face told Dr. Sherwood that the parent would have "slapped the shit out of her" if she were a man but that he would "take care" of the situation himself if this type of event happened again. That parent testified at the hearing in response to a question about what "take care of" meant that he would do "whatever it took" to right the situation, including slapping the teacher. That same parent cursed at Principal Amanda Green in Green's office after banging on the door to get into the office.

- Another parent verbally assaulted a teacher during an awards ceremony at OSD.

- In the Fall of 2015, a parent stopped a school bus, banged on the door, entered the bus, and cursed at its driver for not waiting long enough for a child. The same parent then later appeared at school to yell and curse at the principal.

- In October 2014, the sister of a student enrolled at OSD posted a threat toward a coach on Facebook.

- In the Spring of 2014, a former member of OSD's school Board threatened a coach with physical violence if the coach ever again called the former member's son "lazy."

## B. Procedural Background

Mr. Coffelt filed his Complaint (Doc. 1) against OSD and Dr. Sherwood on November 9, 2017, alleging that the District's actions violated various of his First Amendment rights, including his right to free speech, assembly, and association, as well as his right to due process and equal protection. Submitted contemporaneously with that

Complaint was the present Motion for Preliminary Injunction (Doc. 6). After the Motion was fully briefed, the Court heard oral argument during its scheduled Rule 16 case management hearing. In light of legal questions that had gone unresolved or unmentioned in the parties' original briefing, the Court requested that the parties submit post-hearing briefs. At the hearing, the parties reached an agreement that, during the pendency of this additional briefing period and until the Court ruled on the Motion, Mr. Coffelt would be allowed to attend events where the general public was invited, such as community events held on OSD property, sporting events, or school board meetings. The caveat was that the District would retain its authority to remove Mr. Coffelt from events should his conduct become threatening, harassing, or disruptive.

## II. LEGAL STANDARD

While the standards for granting a preliminary injunction are similar nationwide, in the Eighth Circuit, district courts should consider: (1) the threat of irreparable harm to the movant; (2) the balance between this harm and the injury that granting injunctive relief would inflict on other parties; (3) the movant's likelihood of success on the merits; and (4) whether the injunction is in the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

While no factor is dispositive, "the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citing *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013)). Given the importance of that factor to the overall analysis, the law is clear that "[t]he very nature of the inquiry on petition for preliminary relief militates against a wooden application of the probability test." *Dataphase*, 640 F.2d at 113. Indeed, Mr. Coffelt need only show a "fair chance of

7

prevailing on the merits" in the case at bar. *See Planned Parenthood Minn., N.D, S.D. v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008) ("Only in a case . . . where a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute, must district courts make a threshold finding that a party is *likely* to prevail on the merits." (emphasis added)). Additionally, where the movant demonstrates that the other equity factors tip strongly in his favor, his showing on the likelihood of success on the merits can be less. *Dataphase*, 640 F.2d at 113. Finally, in a case like this where a plaintiff has asserted multiple causes of action, "[t]he plaintiff 'need only establish a likelihood of succeeding on the merits of any of [its] claims." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1041 (quoting *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 250 (D.D.C. 2003)).

### III. DISCUSSION

Because the standard used to determine the movant's likelihood of success on the merits varies according to the strength of the other three equity factors, the Court will consider those factors first.

#### 1. Threat of Irreparable Harm to the Movant

"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959)). "When there is an adequate remedy at law, a preliminary injunction is not appropriate." *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citing *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 738 (8th Cir. 1989)). "An inadequate remedy at law exists only where the injuries cannot be fully compensated

through an award of monetary damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Courts have found that damage awards would be inadequate in a number of circumstances, especially in situations where 1) the award would be speculative because the damages are not easily quantifiable and 2) where the injury is of a continuing nature. Charles A. Wright and Arthur R. Miller, 11A FEDERAL PRACTICE & PROCEDURE § 2944 (3d ed., Apr. 2018) (collecting cases).

Mr. Coffelt has demonstrated irreparable harm. As the Court will further explain below, he has a fair chance of succeeding on the merits of at least his First Amendment claims. And, it is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable [harm]." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)); *see also Marcus v. Iowa Pub. Television*, 97 F.3d 1137, 1140 (8th Cir. 1996) ("If [the movant is] correct and [his] First Amendment rights have been violated, this constitutes an irreparable harm.").

The District's near-absolute exclusion of Mr. Coffelt from all events at OSD[8] has the effect of: barring him from attending athletic events at which his daughter and family members are participating or observing; from serving as an emergency contact for family members who still attend OSD; from visiting his wife who teaches at OSD; from attending and participating in OSD school board meetings which are all held on OSD school

---

[8] Although the latest iteration of the District's ban on Mr. Coffelt suggests that he may attend events at OSD when his daughter who plays for neighboring District, Alpena, is playing sports or is otherwise in attendance, it is not clear that even that concession by OSD was being honored as the Court heard testimony that Mr. Coffelt was not being allowed to attend an event the night of the hearing, even though his daughter would be present.

property; or from attending Omaha community events—many of which are held on OSD school grounds because the small community of Omaha often uses school grounds as a gathering space for community functions. In the absence of injunctive relief, Mr. Coffelt's ban from these events is certainly an ongoing injury not capable of ready quantification. Because standard legal remedies are inadequate to compensate him for the loss of his First Amendment privileges, the Court finds that the loss of First Amendment freedoms in this case constitutes irreparable harm.

### 2. Balance Between the Harm to Movant and Non-Movant

Compared to the irreparable harm that Mr. Coffelt will suffer in the absence of injunctive relief, the Court finds that the harms to the District are largely illusory and speculative. As a result, the Court concludes that the balance of the harms clearly favors Mr. Coffelt because illusory harm does not outweigh actual harm. *See, e.g., Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025 (8th Cir. 1992).

The Court makes this finding for three separate reasons: 1) the long history of Mr. Coffelt's incident-free attendance at OSD events, 2) the fact that the District was already contemplating lifting the ban entirely, and 3) the District's retention of means to remove Mr. Coffelt should his conduct become harassing or threatening. The Court considers each in turn.

First, the evidence that was presented at the hearing reflects that Mr. Coffelt has attended public functions at OSD without incident for over 20 years, first as a student, then as an alumnus, and later as a parent of two students who attended OSD. At no time has Mr. Coffelt ever been removed from a District event for his conduct. Quite the opposite is true, as Mr. Coffelt and the District have enjoyed a mutually beneficial relationship for

some time. In fact, Dr. Sherwood testified that Mr. Coffelt, who drives a dump truck, brought dirt to the OSD campus and had never charged the District for certain other improvements that he had made to OSD property.

Despite the fact that the letter Mr. Coffelt received on April 27, 2017 purported to base its ban solely on the conversation that occurred in Dr. Sherwood's office on April 21, the District put on testimony during the hearing that other instances involving Mr. Coffelt contributed to Dr. Sherwood's decision. The first was an incident precipitated by an automobile accident involving Mr. Coffelt's daughter and the daughter of Mr. Anthony Barber, a maintenance director for OSD and a reserve deputy for the Boone County Sheriff's Office. According to Mr. Barber, Mr. Coffelt confronted him and the two had a drawn out, heated public argument, with both individuals screaming at each other. Both individuals, however, testified that eventually cooler heads prevailed and the two settled down, shook hands, and parted amicably. Of course, Mr. Barber was not banned from OSD events and still is employed by the District.

The second category of testimony involved Mr. Coffelt's presence at athletic events. The testimony was that Mr. Coffelt was a very active observer at athletic contests, often cheering loudly and calling out referees for what he perceived as bad calls. While defense counsel attempted to suggest that Mr. Coffelt threatened or harassed Coach Lincoln at the games by sitting directly behind him, Coach Lincoln denied this characterization but did testify that Mr. Coffelt was a vociferous fan, sometimes texting him after games to discuss wins or losses. In fact, Mr. Coffelt's wife, an OSD employee, was formerly the coach of the girls' basketball team before Coach Lincoln assumed the role. In light of these facts, the District's added justifications for the ban ring hollow,

especially since the vast majority of the events that Mr. Coffelt has been allowed to attend since the ban was imposed have been athletic events.

Next, unbeknownst to Mr. Coffelt and despite language in the numerous letters he received from Dr. Sherwood to the contrary, Dr. Sherwood and the President of the School Board, Francis Blevins, testified that they had already planned to remove the restrictions on Mr. Coffelt, possibly in June at the end of this current school year.

Finally, in the absence of injunctive relief, Mr. Coffelt has no alternative. The District, on the other hand, still has means to protect its students and faculty. That is because nothing about allowing Mr. Coffelt to attend events that are open to the general public would prevent OSD from asking him to leave should his conduct become disruptive. Indeed, the District could simply do what it did initially, which is to use the authority vested in it by Ark. Code Ann. § 6-21-606 to ask him to leave campus. Even when the District agreed to temporarily lift the restrictions until such time as the Court could rule on the motion for preliminary injunction, the Court gave Mr. Coffelt a very stern warning that such permission should not be construed as a license for misconduct.[9] That warning is not watered down in the slightest by the grant of injunctive relief.

### 3. Public Interest

At first blush, the public interest factor appears to be evenly balanced between the parties. For, while "[i]t is always in the public interest to protect constitutional rights," *Phelps-Roper*

---

[9] The Court has been presented with no evidence that Mr. Coffelt caused a disturbance at any of the events that he has been allowed to attend during this period. Given the District's opportunity to raise any issues that had emerged in its post-hearing brief, the Court is left to conclude that Mr. Coffelt's conduct at these events comported with the way that he had behaved for the twenty preceding years.

*v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), there is also no question that "protecting the safety of school staff is undoubtedly a significant government interest." *Lovern v. Edwards*, 190 F.3d 648, 655-56 (4th Cir. 1999) (school officials have discretion to remove parents from school property in response to a threat of disruption).

However, as the Court previously noted, even if the Court grants injunctive relief, the District would not be deprived of its ability to remove Mr. Coffelt from events at which his conduct causes a disturbance. Therefore, the Court finds that the public interest favoring the protection of constitutional rights clearly outweighs the District's interests.

### 4. Likelihood of Success on the Merits

Because the injunctive relief requested would not involve enjoining a state statute, Mr. Coffelt need only show a fair chance of succeeding on the merits. Therefore, the Court must now determine whether Mr. Coffelt has a fair chance of succeeding on the merits of his claims. Because injunctive relief can be granted upon a showing of success on any particular claim, the Court will begin its analysis on the First Amendment claims, as those are the ones that occupied the vast majority of the briefs. Only if the Court determines that Mr. Coffelt does not have a fair chance of success on his First Amendment claims would it need to make a finding on his Due Process and Equal Protection claims.[10]

Despite the importance of the rights at stake, "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to

---

[10] Because a preliminary injunction is, by its very nature, often requested during the infancy of a case, the Court certainly is hesitant about making findings on Mr. Coffelt's likelihood of succeeding on his other claims when it is unnecessary to do so to resolve the instant Motion.

the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800 (1985). Therefore, as the Supreme Court noted in *Perry Education Association v. Perry Local Educators' Association*, "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." 460 U.S. 37, 44 (1983). This forum-based approach to judicial review "applies whether the First Amendment right being exercised is speech . . . or other 'expressive activity' such as assembly." *Travis v. Owego-Apalachin Sch. Dist.*, 927 F.2d 688, 692 (2d Cir. 1991); *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 344 (5th Cir. 2001) ("The Supreme Court has adopted a tripartite forum-based framework to analyze First Amendment issues involving governmentally owned property.").

Relevant case law recognizes three broad categories of First Amendment fora, with a fourth category that is largely a subset of one of the others. *See, e.g., Victory through Jesus Sports Ministry Found. v. Lee's Summit R-7*, 640 F.3d 329, 334 (8th Cir. 2011). Those are the public forum, the limited or designated public forum, and the nonpublic forum. The parties and the Court are all in agreement that OSD created a limited/designated public forum by making a conscious decision to open an otherwise nonpublic forum (a school) to the general public for events, including school board meetings, athletic events, pageants, and other community functions. *See, e.g., Cornelius*, 473 U.S. at 802 ("The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse."); *see also Victory*, 640 F.3d at 334 ("Only if the public entity provides 'general access' does the public property become a designated public forum; if access is

'selective,' it is a nonpublic forum." (citing *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 680 (1998))).

In the Eighth Circuit, regardless of the nomenclature, "[a] limited public forum, like a nonpublic forum, may be 'limited to use by certain groups or dedicated solely to the discussion of certain subjects,' and the public entity 'may impose restrictions on speech that are reasonable and viewpoint-neutral.'" *Victory*, 640 F.3d at 334-35 (citing *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 662 (2010)). Those restrictions, however, cannot be designed to "suppress expression merely because [school] officials oppose the speaker's view." *Hawkins v. City and Cnty. of Denver*, 170 F.3d 1281, 1287 (10th Cir. 1999).

As an initial matter, OSD contends that the Court need not apply the usual forum-based analysis in this case because it argues that the greater weight of authority indicates that individuals have no right to access school property and because a state statute provides it with authority to take the actions it did here. The Court considers each argument in turn.

### A. Right to Attend Events Open to the General Public

The District cites a number of cases where courts have held that a parent's right to direct the education of her children does not extend to a concomitant right to access classes where her child participates. *See* Doc. 21, pp. 3-4. It also cites to a line of cases standing for the proposition that school districts have the authority to protect the public from threatening conduct that disrupts the academic process. *See* Doc. 21, pp. 4-5 (citing cases); *see also Embry v. Lewis*, 215 F.3d 884, 889 (8th Cir. 2000) (noting that "school

officials have broad discretion in restricting visitors on school property to protect the safety and welfare of the school children.").

Nobody disputes these points of law. Indeed, Mr. Coffelt has never in this case requested unfettered access to OSD buildings. As a result, the vast majority of the authorities relied on by the District, while true as general legal postulates, are simply not relevant to the precise legal questions before the Court. The issue in this case has never been whether a parent or member of the general public has an unfettered right to access school grounds during school hours, as many of the plaintiffs contended in the cases the District cites. The answer to that question is clearly "no," as a parent has no right to force open a schoolhouse door that is otherwise closed to the public. The precise legal questions before the Court in this case, however, are two: 1) what rights do members of the general public have to access school events when the school opens an otherwise nonpublic forum and invites the community onto its campus, and 2) what kind of scrutiny applies to restrictions a District seeks to impose on a visitor who belongs to a group of individuals (here, a member of the general public) that the District otherwise welcomes openly? Thus, the great majority of the cases cited by the District provide no answers because they focus on altogether different questions.

While many of the cases cited by the District are not relevant, the vast majority of them relied, either directly or indirectly,[11] on two circuit court opinions, *Lovern v.*

---

[11] For instance, the District cites *Warkevicz v. Berwick Area School District*, 2016 WL 3753108, which relied on the Third Circuit's decision in *Cole v. Montague*, 145 Fed. App'x 760 (3d Cir. 2005), which rested solely on *Lovern v. Edwards*. The Court notes this pattern to demonstrate why it will not recount in seriatim fashion why the numerous district court cases the District relies on, many of which follow the same pattern, are inapplicable as they either address the wrong legal question or are so factually dissimilar that they are readily distinguishable.

*Edwards*[12] and *McCook v. Springer School District*,[13] that *are* relevant. However, those cases are readily distinguishable.

In *Lovern v. Edwards*, a non-custodial father repeatedly harassed school officials in an attempt to make several complaints involving his son. These actions included: petitioning the school to ignore official sanctions that had been placed on the coach; consuming a "substantial amount of the employees' time" through the filing of complaints; discussing his son's non-selection for the varsity basketball team by phoning a coach at work and home, and then confronting him for half an hour during a practice; and, when his attempts were rebuffed, alleging that public school officials were corrupt and were misusing public funds and threatening to bring suit to, *inter alia*, remove the superintendent's "superintendent's license" and to "go forward with a criminal complaint . . . punishable up to ten years in prison." *Lovern v. Edwards*, 190 F.3d 648, 651-53 (4th Cir. 1999). These events all occurred in the wake of several warnings by the school district to Lovern that the child's custodial parent had requested notice and an opportunity to be present before any matters concerning her child were discussed.

When Lovern's threats to commence legal action were unsuccessful, he followed through on the threats by commencing litigation, alleging that his constitutional rights permitted him boundless access to school property, notwithstanding his history of threats and harassment of school officials and the wishes of the custodial parent. The Fourth Circuit rejected that argument.

---

[12] 190 F.3d 648 (4th Cir. 1999).

[13] 44 Fed. App'x 896 (10th Cir. 2002)

*Lovern* is clearly inapposite. As noted above, Mr. Coffelt is not requesting boundless access to school property, during school hours or otherwise. There also is an absence of the type of abusive or harassing conduct that existed in that case. Finally, and perhaps most importantly, the school district in that case proceeded by issuing a series of escalating warnings to Lovern. Indeed, he was initially instructed, because of the custodial parent's wishes, that any conversations regarding his son would need to occur in the presence of his mother. When those warnings went unheeded and Lovern's harassing practices continued, the district then sent him a letter that he was barred "from High School property during *school hours* without [the principal's] express consent and authorization *except to attend scheduled activities open to the public*." *Id.* at 651 n.3 (internal quotation marks omitted and emphasis added). It was only after this letter did not stop Lovern from verbally harassing school officials[14] or making salacious allegations at both public and private school events that the district took the extraordinary step of banning him from school property. *Id.* at 652. Thus, the district did not, as OSD did here, use one private heated conversation to justify an indefinite ban.

In *McCook v. Springer School District*, a student was suspended for a period of five days because clips containing obscenities and sexually explicit language were discovered on a laptop that had previously been checked out to him. 44 Fed. App'x 896, 899-900 (10th Cir. 2002). Because of the suspension, the student was prohibited from being on school property or from attending school activities held during that window, including a Homecoming pep rally. *Id.* The day following his suspension, the student and

---

[14] After receiving this letter, Lovern "telephoned the principal, learned the name of the employee who drafted the letter, and then phoned her, both at her office and at her home, complaining about the letter's contents." *Lovern*, 190 F.3d at 651.

his father drove to school anyway. The superintendent saw the two enter the school and asked them to leave. They refused and a physical confrontation that necessitated police involvement ensued. *Id.* at 900.

Again, *McCook* fundamentally differs from the case at bar. Unlike *McCook*, in Mr. Coffelt's case, there is no willful violation of a prior exclusion order. Although Dr. Sherwood initially testified that he told Mr. Coffelt on April 21st not to return, he later admitted that he had not done so and that he thought it would just have been implied. It was only a week later that Mr. Coffelt was notified that he was banned. Even when Mr. Coffelt attempted to seek redress with the School Board, he faithfully complied with all requirements the District imposed (*i.e.* seeking advanced approval since the meeting was held on school property and complying with the requirement that he be accompanied by a police escort at his daughter's graduation and athletic banquet). Moreover, as noted above, there is no evidence that the police have ever had to be called to remove Mr. Coffelt from campus for disrupting public events.

Enter *Johnson v. Perry*. Decided in June of 2017, this Second Circuit case is the most closely analogous case that the Court has been able to locate. Just like the case at bar, *Johnson* involved a parent who had been banned from his child's school after a particularly contentious meeting with a school official. 859 F.3d 156, 163 (2d Cir. 2017). Just like in the present case, the parent requested the meeting to complain about perceived bullying being committed against his child by school officials. *Id.* Just like in the present case, the father, sensing intransigence on the part of the school officials, became

19

upset, slammed his hand on the table,[15] and told the school official that he was a "liar"
and was "full of shit." *Id.* The following day, the father received a similar note informing
him that he too was banned from attending events, whether on or off campus.

The *Johnson* Court concluded, as does this Court, that:

> [t]o the extent that Johnson's First Amendment claim focuses on his
> exclusion from the audience at Capital Prep basketball games, however, it
> stands on a different footing, because for such games the school invites the
> attendance of members of the public . . . [and] courts, libraries, and
> hospitals, unlike schools, do not normally stage events at which the
> audience is encouraged not to be quiet but instead to engage in raucous
> and sustained noise. Peace, quiet, and tranquility are not characteristics of,
> or normally associated with, sports contests.
> . . .
>
> While the invitation to parents and other spectators to attend basketball
> games would not constitute an invitation to anyone to disrupt the game or
> intermissions with speeches about his or her views on school policy
> generally, or political issues, or other subjects not related to the sporting
> event, persons attending the game are expected to engage in expressive
> activity, chanting and cheering for whichever team they favor. Indeed, they
> are encouraged to do so; many schools even have at the games groups of
> students whose function is to lead the audience in boisterous expressions
> of encouragement and partisanship.

859 F.3d at 175.

The District argues that *Johnson* should not have dispositive weight here because
it is not as factually analogous as another case, *Henson v. Tucson Unified School District*,
which was a case from the Arizona Court of Appeals. 2007 Ariz. App. Unpub. LEXIS 1106
(Ariz. Ct. App. 2007). In *Henson*, an unruly parent and her daughter were banned, initially
just from practices, but later from games, for conduct deemed threatening, following a

---

[15] It is clear from the testimony heard during the motion hearing that whether Mr. Coffelt
smacked his hand on the table during the April 21st incident is disputed by the parties.
Nevertheless, the Court assumes that it happened here to demonstrate that, even if it did,
it does not change just how closely analogous these two cases are.

written notice that further disruptive or harassing behavior would not be tolerated. *Id.* at *2-*3. Unlike Mr. Coffelt, the Henson plaintiffs made actual threats to students, including one plaintiff who made a slashing gesture across her throat to certain students on the girls' team. *Id.* at *3. When they later refused to leave the game, a police officer removed them from the school. Despite this history of threatening behavior, the school district only sought to "deny admission to [them] to the last girls varsity basketball game" of the year. *Id.* It did not institute the type of indefinite ban that the District did here, nor did it ban these plaintiffs from all other district events open to the public.

Although the reason is never stated,[16] the Court is left to presume that the District believes that *Johnson*, *Lovern*, *McCook*, and *Henson* are distinguishable from the case at bar because these cases all involved parents who had students who still attended the school district at the time of their bans. This *is* a distinction, but it is one that makes no difference to the Court's ultimate conclusion. For *Johnson* rested its ultimate conclusion not on the fact that this was a parent, but rather on the fact that the District had voluntarily opened what would otherwise be a nonpublic forum to members of the general public,

---

[16] The District does make the argument that in *Johnson*, the coach and administrator were the "villains" while the plaintiff was the "saint." Doc. 21, p. 11. It contends the roles are reversed here. Despite the fact that Mr. Coffelt would surely dispute this version of the facts (after all, he had the District launch an investigation into Coach Lincoln that bore some fruit), it must be remembered that Dr. Sherwood testified that Mr. Coffelt's ban was because he yelled at Dr. Sherwood, calling him a liar, and yelled at Coach Lincoln, calling him a chicken shit, in ways that were perceived as threatening. It's quite ironic then that the District believes that Mr. Johnson was a "saint" when he, in the same type of closed-door meeting, banged his hands on the table and yelled at the same type of school officials that they were liars and full of shit. Moreover, it was Dr. Sherwood, not Mr. Coffelt, who escalated the April 21st meeting by following Mr. Coffelt out of the office yelling at him to "get the hell off my property," making it more likely that any children who happened to be down the hall in that building would hear the profanity.

and that it invited these members of the public to events where they were expressly encouraged to engage in the type of boisterous cheering that accompanies these events.

For these reasons, Mr. Coffelt has persuaded the Court that he is likely to succeed in demonstrating a right to attend events that are otherwise open to the general public.

## B. The Effect of Arkansas Code § 6-21-606

The District's second argument for why the Court need not consider a forum-based analysis is that a section of the Arkansas Code, §6-21-606, provides statutory authority for the District to do exactly what it did. Arkansas Code § 6-21-606 reads:

> Any persons who shall, by any boisterous or other conduct, disturb or annoy any public or private school in this state or any person not a student who after being notified to keep off the school grounds during the school hours by the board of directors, the superintendent, or principal teacher in charge of any such school shall continue to trespass on or go upon the grounds, whether at recess or during the sessions of the school, shall be guilty of a violation and upon conviction shall be fined in any sum not exceeding one hundred dollars ($100), payable into the general school fund of the county.

This argument can be disposed of rather quickly. For, whatever authority this section vests in school districts, it cannot authorize them to act in a way that independently violates the Constitution. The District was foreclosed from making that argument as long ago as 1787 when the Founders included the Supremacy Clause in Article VI. Therefore, the existence of this state statute does not obviate the need to decide whether Mr. Coffelt has made out a constitutional violation using the forum-based approach employed in First Amendment cases.

## C. Reasonable and Viewpoint-Neutral

As noted above, in a limited public forum, school districts and other governmental entities may enact restrictions as long as those restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's

22

views. *Ark. Educ. Television Comm'n*, 523 U.S. at 677-78 (1998); *Powell v. Noble*, 798 F.3d 690, 700 (8th Cir. 2015).

Given the evidence adduced at the hearing, the Court cannot conclude that OSD's restrictions on Mr. Coffelt were reasonable. As it has noted throughout this opinion, the evidence certainly revealed that Mr. Coffelt had a history of cheering very loudly, of protesting calls he thought were unfair, and of taking an interest in the success of the OSD athletic teams that he (and his wife) had supported for some time. In addition, there is no dispute that everyone in the closed-door meeting on April 21st lost their tempers. But, that a heated discussion in a closed-door meeting would produce such a sweeping and restrictive response from the District gives the Court pause.

The cases the District cites for the proposition that its restrictions on Mr. Coffelt were both reasonable and viewpoint-neutral make it clear that they were anything but. A few examples of plaintiffs who received somewhat similar bans illustrates the Court's concerns:

- In *Henley v. Octorara Area School District*, Henley and a friend proceeded to damage Amish farm wagons and crops, and slaughter at least two sheep by knifing or running them over. A carcass of one of the sheep, with its throat slit, was dumped on the grounds of the local high school where it would be in plain view of students entering the school. Henley was banned from entering district property after an investigation revealed that he had "engaged in criminal activities involving school students including a criminal conspiracy with Octorara Area High School students." 701 F.Supp. 545, 546-47, 551 (E.D. Penn. 1988).

- In *Mejia v. Holt Public Schools*, a father of a student was banned from school grounds indefinitely because he masturbated in his car parked in the school parking lot while waiting to pick up his child at elementary school. 2002 WL 1492205, at *1 (W.D. Mich. 2002).

Moreover, as Mr. Coffelt rightly points out, the District's asserted justifications for banning him from all public events due to safety concerns look even more doubtful when the Court considers the District's Visitor Policy.[17] That policy provides:

> Parents, grandparents, legal guardians, business, and community members are welcome and encouraged to visit District schools. To minimize the potential for disruption of the learning environment, visitors, for a purpose other than to attend an activity open to the general public, are required to first report to the school's main office. No one shall be exempt from this requirement. Visitors who are Level 3 or Level 4 sex offenders may only enter a school campus under the provisions listed in Policy 6.10.

Policy 6.10, in turn, provides:

> Level 3 and Level 4 sex offenders may only enter the school campus in the following instances.
>
> . . .
>
> 2. To attend a graduation or baccalaureate ceremony, or a school sponsored event for which an admission fee is charged or tickets are sold or distributed.

Omaha School District Policy, 6.10 Sex Offenders on Campus (Megan's Law)[18]

It appears, therefore, that Level 3 and Level 4 sex offenders, many of whom are considered violent sexual predators who are likely to recidivate,[19] have more of a right to access events held on OSD school property than does Mr. Coffelt. Given all of the above,

---

[17] The Visitor Policy was received as a defense exhibit during the hearing. Moreover, the Court may take judicial notice of the official policies of the District. *See, e.g., Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016) (citing *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 648 (7th Cir. 2011)); *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010).

[18] Available at http://omahaschool.weebly.com/uploads/3/1/1/1/31117011/section_6_-_community_relations.pdf.

[19] See Arkansas Crime Information Center for discussion on the various Sex Offender Levels. http://www.acic.org/sex-offender-information.

the Court cannot conclude that OSD's ban was reasonable or viewpoint-neutral. Therefore, it concludes that Mr. Coffelt has a fair chance of succeeding on his First Amendment claims.

On balance, the Court concludes that Mr. Coffelt has made the requisite showing for preliminary injunctive relief.

### IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff Randy Coffelt's Motion for a Preliminary Injunction (Doc. 5) is **GRANTED**. During the pendency of this litigation, Omaha School District, its Superintendent Jacob Sherwood, and its other Officers and Agents are enjoined from banning Mr. Coffelt from events on Omaha School District property that are otherwise open to the general public. However, the Court would reiterate here that the issuance of this preliminary injunction **does not** alter the District's ability to remove Mr. Coffelt from public events should his conduct become disruptive or threatening.

**IT IS SO ORDERED** on this _11th_ day of May, 2018.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE